826 F.2d 678
 4 UCC Rep.Serv.2d 369
 R.E. DAVIS CHEMICAL CORPORATION, an Illinois corporation,
Plaintiff-Appellee,
v.
DIASONICS, INC., a California corporation, Defendant Third
Party Plaintiff- Appellant,
v.
Glen D. DOBBIN and Galdino Valvassori, Third Party Defendants.
 No. 86-2875.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 24, 1987.
Decided Aug. 13, 1987.
Rehearing and Rehearing En Banc Denied Sept. 10, 1987.
 
 George M. Hoffman, Neal Gerber & Eisenberg, Chicago, Ill., for third-party defendant-appellant.
 Erwin I. Katz, Chicago, Ill., for third-party defendant-appellee.
 Sherwin J. Malkin, Sherwin J. Malkin, Ltd., Chicago, Ill., for plaintiff-appellee.
 Before BAUER, Chief Circuit Judge, CUDAHY and FLAUM, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 Diasonics, Inc. appeals from the orders of the district court denying its motion for summary judgment and granting R.E. Davis Chemical Corp.'s summary judgment motion. Diasonics also appeals from the order dismissing its third-party complaint against Dr. Glen D. Dobbin and Dr. Galdino Valvassori. We affirm the dismissal of the third-party complaint, reverse the grant of summary judgment in favor of Davis and remand for further proceedings.
 
 I.
 
 2
 Diasonics is a California corporation engaged in the business of manufacturing and selling medical diagnostic equipment. Davis is an Illinois corporation that contracted to purchase a piece of medical diagnostic equipment from Diasonics. On or about February 23, 1984, Davis and Diasonics entered into a written contract under which Davis agreed to purchase the equipment. Pursuant to this agreement, Davis paid Diasonics a $300,000 deposit on February 29, 1984. Prior to entering into its agreement with Diasonics, Davis had contracted with Dobbin and Valvassori to establish a medical facility where the equipment was to be used. Dobbin and Valvassori subsequently breached their contract with Davis. Davis then breached its contract with Diasonics; it refused to take delivery of the equipment or to pay the balance due under the agreement. Diasonics later resold the equipment to a third party for the same price at which it was to be sold to Davis.
 
 
 3
 Davis sued Diasonics, asking for restitution of its $300,000 down payment under section 2-718(2) of the Uniform Commercial Code (the "UCC" or the "Code"). Ill.Rev.Stat. ch. 26, para. 2-718(2) (1985).[1] Diasonics counterclaimed. Diasonics did not deny that Davis was entitled to recover its $300,000 deposit less $500 as provided in section 2-718(2)(b). However, Diasonics claimed that it was entitled to an offset under section 2-718(3). Diasonics alleged that it was a "lost volume seller," and, as such, it lost the profit from one sale when Davis breached its contract. Diasonics' position was that, in order to be put in as good a position as it would have been in had Davis performed, it was entitled to recover its lost profit on its contract with Davis under section 2-708(2) of the UCC. Ill.Rev.Stat. ch. 26, para. 2-708(2) (1985). Section 2-708 provides:
 
 
 4
 Sec. 2-708. Seller's Damages for Non-acceptance or Repudiation
 
 
 5
 (1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2-710), but less expenses saved in consequence of the buyer's breach.
 
 
 6
 (2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.
 
 
 7
 Diasonics subsequently filed a third-party complaint against Dobbin and Valvassori, alleging that they tortiously interfered with its contract with Davis. Diasonics claimed that the doctors knew of the contract between Davis and Diasonics and also knew that, if they breached their contract with Davis, Davis would have no use for the equipment it had agreed to buy from Diasonics.
 
 
 8
 The district court dismissed Diasonics' third-party complaint for failure to state a claim upon which relief could be granted, finding that the complaint did not allege that the doctors intended to induce Davis to breach its contract with Diasonics. The court also entered summary judgment for Davis. The court held that lost volume sellers were not entitled to recover damages under 2-708(2) but rather were limited to recovering the difference between the resale price and the contract price along with incidental damages under section 2-706(1). Ill.Rev.Stat. ch. 26, para. 2-706(1) (1985). Section 2-706(1) provides:
 
 
 9
 Sec. 2-706. Seller's Resale Including Contract for Resale
 
 
 10
 (1) Under the conditions stated in Section 2-703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (Section 2-710), but less expenses saved in consequence of the buyer's breach.
 
 
 11
 Davis was awarded $322,656, which represented Davis' down payment plus prejudgment interest less Diasonics' incidental damages. Diasonics appeals the district court's decision respecting its measure of damages as well as the dismissal of its third-party complaint.
 
 II.
 
 12
 We consider first Diasonics' claim that the district court erred in holding that Diasonics was limited to the measure of damages provided in 2-706 and could not recover lost profits as a lost volume seller under 2-708(2). Surprisingly, given its importance, this issue has never been addressed by an Illinois court, nor, apparently, by any other court construing Illinois law. Thus, we must attempt to predict how the Illinois Supreme Court would resolve this issue if it were presented to it. Courts applying the laws of other states have unanimously adopted the position that a lost volume seller can recover its lost profits under 2-708(2).[2] Contrary to the result reached by the district court, we conclude that the Illinois Supreme Court would follow these other cases and would allow a lost volume seller to recover its lost profit under 2-708(2).
 
 
 13
 We begin our analysis with 2-718(2) and (3).[3] Under 2-718(2)(b), Davis is entitled to the return of its down payment less $500. Davis' right to restitution, however, is qualified under 2-718(3)(a) to the extent that Diasonics can establish a right to recover damages under any other provision of Article 2 of the UCC. Article 2 contains four provisions that concern the recovery of a seller's general damages (as opposed to its incidental or consequential damages): 2-706 (contract price less resale price); 2-708(1) (contract price less market price); 2-708(2) (profit); and 2-709 (price). The problem we face here is determining whether Diasonics' damages should be measured under 2-706 or 2-708(2).[4] To answer this question, we need to engage in a detailed look at the language and structure of these various damage provisions.
 
 
 14
 The Code does not provide a great deal of guidance as to when a particular damage remedy is appropriate. The damage remedies provided under the Code are catalogued in section 2-703, but this section does not indicate that there is any hierarchy among the remedies.[5] One method of approaching the damage sections is to conclude that 2-708 is relegated to a role inferior to that of 2-706 and 2-709 and that one can turn to 2-708 only after one has concluded that neither 2-706 nor 2-709 is applicable.[6] Under this interpretation of the relationship between 2-706 and 2-708, if the goods have been resold, the seller can sue to recover damages measured by the difference between the contract price and the resale price under 2-706. The seller can turn to 2-708 only if it resells in a commercially unreasonable manner or if it cannot resell but an action for the price is inappropriate under 2-709. The district court adopted this reading of the Code's damage remedies and, accordingly, limited Diasonics to the measure of damages provided in 2-706 because it resold the equipment in a commercially reasonable manner.
 
 
 15
 The district court's interpretation of 2-706 and 2-708, however, creates its own problems of statutory construction. There is some suggestion in the Code that the "fact that plaintiff resold the goods [in a commercially reasonable manner] does not compel him to use the resale remedy of Sec. 2-706 rather than the damage remedy of Sec. 2-708." Harris, A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared, 18 Stan.L.Rev. 66, 101 n. 174 (1965) (emphasis in original). Official comment 1 to 2-703, which catalogues the remedies available to a seller, states that these "remedies are essentially cumulative in nature" and that "[w]hether the pursuit of one remedy bars another depends entirely on the facts of the individual case." See also State of New York, Report of the Law Revision Comm'n for 1956, 396-97 (1956).[7]
 
 
 16
 Those courts that found that a lost volume seller can recover its lost profits under 2-708(2) implicitly rejected the position adopted by the district court; those courts started with the assumption that 2-708 applied to a lost volume seller without considering whether the seller was limited to the remedy provided under 2-706. None of those courts even suggested that a seller who resold goods in a commercially reasonable manner was limited to the damage formula provided under 2-706. We conclude that the Illinois Supreme Court, if presented with this question, would adopt the position of these other jurisdictions and would conclude that a reselling seller, such as Diasonics, is free to reject the damage formula prescribed in 2-706 and choose to proceed under 2-708.
 
 
 17
 Concluding that Diasonics is entitled to seek damages under 2-708, however, does not automatically result in Diasonics being awarded its lost profit. Two different measures of damages are provided in 2-708.[8] Subsection 2-708(1) provides for a measure of damages calculated by subtracting the market price at the time and place for tender from the contract price.[9] The profit measure of damages, for which Diasonics is asking, is contained in 2-708(2). However, one applies 2-708(2) only if "the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done...." Ill.Rev.Stat. ch. 26, para. 2-708(2) (1985). Diasonics claims that 2-708(1) does not provide an adequate measure of damages when the seller is a lost volume seller.[10] To understand Diasonics' argument, we need to define the concept of the lost volume seller. Those cases that have addressed this issue have defined a lost volume seller as one that has a predictable and finite number of customers and that has the capacity either to sell to all new buyers[11] or to make the one additional sale represented by the resale after the breach.[12] According to a number of courts and commentators, if the seller would have made the sale represented by the resale whether or not the breach occurred, damages measured by the difference between the contract price and market price cannot put the lost volume seller in as good a position as it would have been in had the buyer performed.[13] The breach effectively cost the seller a "profit," and the seller can only be made whole by awarding it damages in the amount of its "lost profit" under 2-708(2).
 
 
 18
 We agree with Diasonics' position that, under some circumstances, the measure of damages provided under 2-708(1) will not put a reselling seller in as good a position as it would have been in had the buyer performed because the breach resulted in the seller losing sales volume. However, we disagree with the definition of "lost volume seller" adopted by other courts. Courts awarding lost profits to a lost volume seller have focused on whether the seller had the capacity to supply the breached units in addition to what it actually sold. In reality, however, the relevant questions include, not only whether the seller could have produced the breached units in addition to its actual volume, but also whether it would have been profitable for the seller to produce both units. Goetz & Scott, Measuring Sellers' Damages: The Lost-Profits Puzzle, 31 Stan.L.Rev. 323, 332-33, 346-47 (1979). As one commentator has noted, under
 
 
 19
 the economic law of diminishing returns or increasing marginal costs[,] ... as a seller's volume increases, then a point will inevitably be reached where the cost of selling each additional item diminishes the incremental return to the seller and eventually makes it entirely unprofitable to conclude the next sale.
 
 
 20
 Shanker, supra p. 7 n. 6, at 705. Thus, under some conditions, awarding a lost volume seller its presumed lost profit will result in overcompensating the seller, and 2-708(2) would not take effect because the damage formula provided in 2-708(1) does place the seller in as good a position as if the buyer had performed. Therefore, on remand, Diasonics must establish, not only that it had the capacity to produce the breached unit in addition to the unit resold, but also that it would have been profitable for it to have produced and sold both. Diasonics carries the burden of establishing these facts because the burden of proof is generally on the party claiming injury to establish the amount of its damages; especially in a case such as this, the plaintiff has easiest access to the relevant data. Finance America Commercial Corp. v. Econo Coach, Inc., 118 Ill.App.3d 385, 390, 73 Ill.Dec. 878, 882, 454 N.E.2d 1127, 1131 (2d Dist.1983) ("A party seeking to recover has the burden not only to establish that he sustained damages but also to establish a reasonable basis for computation of those damages.") (citation omitted); see also Snyder, 38 Md.App. at 158-59 & n. 7, 380 A.2d at 627 & n. 7.[14]
 
 
 21
 One final problem with awarding a lost volume seller its lost profits was raised by the district court. This problem stems from the formulation of the measure of damages provided under 2-708(2) which is "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." Ill.Rev.Stat. ch. 26, para. 2-708(2) (1985) (emphasis added). The literal language of 2-708(2) requires that the proceeds from resale be credited against the amount of damages awarded which, in most cases, would result in the seller recovering nominal damages. In those cases in which the lost volume seller was awarded its lost profit as damages, the courts have circumvented this problem by concluding that this language only applies to proceeds realized from the resale of uncompleted goods for scrap. See, e.g., Neri, 30 N.Y.2d at 399 & n. 2, 334 N.Y.S.2d at 169 & n. 2, 285 N.E.2d at 314 & n. 2; see also J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code Sec. 7-13, at 285 ("courts should simply ignore the 'due credit' language in lost volume cases") (footnote omitted). Although neither the text of 2-708(2) nor the official comments limit its application to resale of goods for scrap, there is evidence that the drafters of 2-708 seemed to have had this more limited application in mind when they proposed amending 2-708 to include the phrase "due credit for payments or proceeds of resale."[15] We conclude that the Illinois Supreme Court would adopt this more restrictive interpretation of this phrase rendering it inapplicable to this case.
 
 
 22
 We therefore reverse the grant of summary judgment in favor of Davis and remand with instructions that the district court calculate Diasonics' damages under 2-708(2) if Diasonics can establish, not only that it had the capacity to make the sale to Davis as well as the sale to the resale buyer, but also that it would have been profitable for it to make both sales. Of course, Diasonics, in addition, must show that it probably would have made the second sale absent the breach.[16]
 
 III.
 A.
 
 23
 Diasonics also appeals the district court's dismissal of its third-party complaint against Dobbin and Valvassori. The complaint alleged that the doctors tortiously interfered with Diasonics' contract with Davis and sought as damages Diasonics' lost profit. The district court dismissed the third-party complaint for failure to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6).
 
 
 24
 A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). The facts as alleged in Diasonics' third-party complaint are as follows. Dobbin and Valvassori are physicians who had agreed to perform professional services at a medical facility to be established by Davis. The equipment ordered by Davis from Diasonics was to be used at this facility. "Dobben [sic] and Valvassori were aware that Davis had entered into the ... contract with Diasonics," and they "were further aware that the equipment would be of essentially no value to Davis if they failed to provide their services in connection with operating the equipment...." Third-Party Complaint paragraphs 8, 9. Dobbin and Valvassori breached their contract with Davis in order to establish their own facility, though they "knew that their conduct was reasonably certain to cause a breach by Davis of its contract with Diasonics...." Id. p 10.
 
 
 25
 The elements of the tort of interference with contractual relations under Illinois law are:
 
 
 26
 a valid contract, defendant's knowledge of the existence of the contract, defendant's intentional and malicious inducement of the breach of the contract, breach of the contract caused by defendant's wrongful conduct and resultant damage to the plaintiff.
 
 
 27
 Swager v. Couri, 60 Ill.App.3d 192, 196, 17 Ill.Dec. 457, 460, 376 N.E.2d 456, 459 (3d Dist.1978) (citation omitted), aff'd, 77 Ill.2d 173, 32 Ill.Dec. 540, 395 N.E.2d 921 (1979); see also Galinski v. Kessler, 134 Ill.App.3d 602, 610, 89 Ill.Dec. 433, 439, 480 N.E.2d 1176, 1182 (1st Dist.1985). The district court dismissed the complaint because it did not allege that the doctors intended to induce Davis to breach its contract with Diasonics. We agree.
 
 
 28
 Diasonics claims on appeal that, to establish the tort of intentional interference with contractual relations, it need only show that the doctors knew of its contract with Davis and that they realized that breaching their own contract with Davis was substantially certain to interfere with Davis' ability to perform its contract with Diasonics.
 
 
 29
 Whether knowledge that one's conduct is substantially certain to induce a party to breach its contract with another is a sufficient basis on which to predicate liability is an issue of first impression in Illinois. Although no Illinois court has directly addressed the question presented here, at least one Illinois case that discusses the tort of intentional interference with contractual relations lends support to the district court's decision to dismiss Diasonics' third-party complaint. In LaRocco v. Bakwin, 108 Ill.App.3d 723, 730, 64 Ill.Dec. 286, 291-92, 439 N.E.2d 537, 542-43 (2d Dist.1982), the court endorsed the factors outlined in section 767 of the Restatement (Second) of Torts used to determine whether a defendant's interference with a contractual relation was improper. These factors include the defendant's motive in interfering with the contract; the Restatement's discussion of this factor suggests that the doctors' conduct in this case was not tortious. The Restatement provides that:
 
 
 30
 the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct.... Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about.
 
 
 31
 Restatement (Second) of Torts Sec. 767, comment d, at 32 (1979).[17] Diasonics did not allege, nor do the facts suggest, that the doctors in any way desired that Davis breach its contract with Diasonics.
 
 
 32
 Apparently, courts in only a few jurisdictions have directly addressed the issue before us, and they have concluded that something more is needed than is alleged here to hold a party liable for intentional interference with contractual relations. In Wometco Theatres v. United Artists Corp., 53 Ga.App. 509, 186 S.E. 572 (1935), the plaintiff, Wometco, was an exhibitor of motion pictures and the defendant, United Artists, distributed pictures. United Artists had an agreement with a third party, Sparks East Coast Theatres, under which it would supply pictures for Sparks to exhibit. Sparks entered into a contract with the plaintiff under which the plaintiff was given the right to exhibit some of the pictures Sparks obtained from the defendant. United Artists failed to supply some motion pictures to Sparks which Sparks had given Wometco the right to exhibit. Wometco sued United Artists, alleging, in part, that United Artists had tortiously interfered with the contract between Wometco and Sparks. In rejecting this claim, the court stated:
 
 
 33
 The mere failure of a party to a contract to carry out its terms will not give rise to a cause of action ex delicto against it, to a third party who has contracted with the opposite party to such contract, although in breaching the contract such person may be charged with notice that the opposite party will not be able to perform its contract with such third party.
 
 
 34
 Wometco, 53 Ga.App. at 513-14, 186 S.E. at 574-75 (emphasis in original); see also New York Trust Co. v. Island Oil & Trans. Corp., 34 F.2d 649, 652 (2d Cir.1929) (L. Hand, J.); In re Douglas Dunhill, Inc., 22 B.R. 953, 957 (Bankr.N.D.Ill.1982); Lamport v. 4175 Broadway, 6 F.Supp. 923, 924 (S.D.N.Y.1934).
 
 
 35
 We conclude that the Illinois Supreme Court would find that the element of "inducement" in the context of a claim for intentional interference with contractual relations requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another. Because Diasonics' third-party complaint alleged nothing more than this, the district court was correct in dismissing the complaint for failure to state a claim.
 
 B.
 
 36
 Dobbin and Valvassori also claim that Diasonics' notice of appeal is defective and, therefore, we should dismiss the appeal. The district court issued three separate orders in this case. In an order dated June 13, 1986, the court denied Davis' and Diasonics' motions for summary judgment. On September 19, 1986, the district court dismissed Diasonics' third-party complaint against the doctors. In its final order, dated November 4, 1986, the court entered judgment for Davis and stated that its "judgment entered herein shall be deemed final and there is no just reason to delay the enforcement thereof or the appeal therefrom." Diasonics' notice of appeal indicated that it was appealing from the order of the district court entered on November 4, 1986. Dobbin and Valvassori claim that this notice of appeal is defective because it does not state that Diasonics is also appealing from the September 19, 1986 order dismissing the third-party complaint.
 
 
 37
 This argument is without merit. The September 19, 1986 order was not a final order for purposes of appeal because no final judgment had been entered with respect to the claims between Davis and Diasonics. The district court's order of November 4, 1986, from which Diasonics clearly appealed, made the September 19, 1986 order final and appealable. "An appeal from the final judgment draws in question all prior non-final orders and all rulings which produced the judgment." 9 J. Moore, B. Ward & J. Lucas, 9 Moore's Federal Practice p 203.18, at 3-80 (2d ed. 1987) (footnote omitted); see also Herron v. Rozelle, 480 F.2d 282, 285 (10th Cir.1973).
 
 
 38
 Even if Diasonics erred by failing to indicate specifically that it was appealing from the dismissal of the third-party complaint, this mistake by itself does not support dismissing the notice of appeal as to the doctors.
 
 
 39
 The rule is now well settled that a mistake in designating the judgment, or in designating the part appealed from if only a part is designated, should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake.
 
 
 40
 9 Moore's p 203.18, at 3-76--3-77 (footnotes omitted); see also Foman v. Davis, 371 U.S. 178, 181-82, 83 S.Ct. 227, 229-30, 9 L.Ed.2d 222 (1962). The doctors knew that Diasonics was appealing from the September 19, 1986 order, and they specifically state in their brief that they were not prejudiced by the notice of appeal. Brief of Third Party Defendants-Appellees at 14. It is hard to see how the doctors could contend that they were surprised that Diasonics was appealing the dismissal of the third-party complaint in light of the fact that Diasonics filed an earlier notice of appeal on October 20, 1986 from the September 19, 1986 order; that appeal was dismissed voluntarily because no final judgment had been entered with respect to the claims pending between Davis and Diasonics.[18]
 
 IV.
 
 41
 Accordingly, we affirm the district court's dismissal of the third-party complaint, reverse the grant of summary judgment in favor of Davis and remand for further proceedings consistent with this opinion.
 
 
 42
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 The pertinent portion of section 2-718 provides:
 Sec. 2-718. Liquidation or Limitation of Damages; Deposits
 ....
 (2) Where the seller justifiably withholds delivery of goods because of the buyer's breach, the buyer is entitled to restitution of any amount by which the sum of his payments exceeds
 (a) the amount to which the seller is entitled by virtue of terms liquidating the seller's damages in accordance with subsection (1), or
 (b) in the absence of such terms, 20% of the value of the total performance for which the buyer is obligated under the contract or $500, whichever is smaller.
 (3) The buyer's right to restitution under subsection (2) is subject to offset to the extent that the seller establishes
 (a) a right to recover damages under the provisions of this Article other than subsection (1), and
 (b) the amount or value of any benefits received by the buyer directly or indirectly by reason of the contract.
 Ill.Rev.Stat. ch. 26, para. 2-718(2) & (3) (1985).
 
 
 [2]
 See, e.g., Comeq, Inc. v. Mitternight Boiler Works, Inc., 456 So.2d 264, 267-69 (Ala.Sup.Ct.1984); Autonumerics, Inc. v. Bayer Ind., Inc., 144 Ariz. 181, 191, 696 P.2d 1330, 1340 (Ariz.App.Ct.1984); Capital Steel Co. v. Foster & Creighton Co., 264 Ark. 683, 689, 574 S.W.2d 256, 259-60 (Sup.Ct.1978); National Controls, Inc. v. Commodore Business Machines, Inc., 163 Cal.App.3d 688, 696-99, 209 Cal.Rptr. 636, 641-43 (1st Dist.1985); Snyder v. Herbert Greenbaum & Assocs., Inc., 38 Md.App. 144, 153-54, 380 A.2d 618, 624-25 (1977); Teradyne, Inc. v. Teledyne Ind., Inc., 676 F.2d 865, 868 (1st Cir.1982) (applying Massachusetts law); Neri v. Retail Marine Corp., 30 N.Y.2d 393, 397-99, 334 N.Y.S.2d 165, 167-70, 285 N.E.2d 311, 313-14 (1972); Lake Erie Boat Sales, Inc. v. Johnson, 11 Ohio App.3d 55, 56, 463 N.E.2d 70, 71-72 (1983); Famous Knitwear Corp. v. Drug Fair, Inc., 493 F.2d 251, 253-54 (4th Cir.1974) (applying Virginia law); Islamic Republic of Iran v. Boeing Co., 771 F.2d 1279, 1289-90 (9th Cir.1985) (applying Washington law), cert. dismissed, --- U.S. ----, 107 S.Ct. 450, 93 L.Ed.2d 397 (1986)
 
 
 [3]
 Supra p. 680 n. 1
 
 
 [4]
 An action for the price, provided for under 2-709, is not an option in this case because Diasonics resold the equipment that it had intended to sell to Davis
 
 
 [5]
 Section 2-703 provides:
 Sec. 2-703. Seller's Remedies in General
 Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (Section 2-612), then also with respect to the whole undelivered balance, the aggrieved seller may
 (a) withhold delivery of such goods;
 (b) stop delivery by any bailee as hereafter provided (Section 2-705);
 (c) proceed under the next section respecting goods still unidentified to the contract;
 (d) resell and recover damages as hereafter provided (Section 2-706);
 (e) recover damages for non-acceptance (Section 2-708) or in a proper case the price (Section 2-709);
 (f) cancel.
 Ill.Rev.Stat. ch. 26, para. 2-703 (1985).
 
 
 [6]
 Evidence to support this approach can be found in the language of the various damage sections and of the official comments to the UCC. See Sec. 2-709(3) ("a seller who is held not entitled to the price under this Section shall nevertheless be awarded damages for non-acceptance under the preceding section [Sec. 2-708]"); UCC comment 7 to Sec. 2-709 ("[i]f the action for the price fails, the seller may nonetheless have proved a case entitling him to damages for non-acceptance [under Sec. 2-708]"); UCC comment 2 to Sec. 2-706 ("[f]ailure to act properly under this section deprives the seller of the measure of damages here provided and relegates him to that provided in Section 2-708"); UCC comment 1 to Sec. 2-704 (describes Sec. 2-706 as the "primary remedy" available to a seller upon breach by the buyer); see also Commonwealth Edison Co. v. Decker Coal Co., 653 F.Supp. 841, 844 (N.D.Ill.1987) (statutory language and case law suggest that "Sec. 2-708 remedies are available only to a seller who is not entitled to the contract price" under Sec. 2-709); Childres & Burgess, Seller's Remedies: The Primacy of UCC 2-708(2), 48 N.Y.U.L.Rev. 833, 863-64 (1973). As one commentator has noted, 2-706
 is the Code section drafted specifically to define the damage rights of aggrieved reselling sellers, and there is no suggestion within it that the profit formula of section 2-708(2) is in any way intended to qualify or be superior to it.
 Shanker, The Case for a Literal Reading of UCC Section 2-708(2) (One Profit for the Reseller), 24 Case W.Res. 697, 699 (1973).
 
 
 [7]
 UCC comment 2 to 2-708(2) also suggests that 2-708 has broader applicability than suggested by the district court. UCC comment 2 provides:
 This section permits the recovery of lost profits in all appropriate cases, which would include all standard priced goods. The normal measure there would be list price less cost to the dealer or list price less manufacturing cost to the manufacturer.
 The district court's restrictive interpretation of 2-708(2) was based in part on UCC comment 1 to 2-704 which describes 2-706 as the aggrieved seller's primary remedy. The district court concluded that, if a lost volume seller could recover its lost profit under 2-708(2), every seller would attempt to recover damages under 2-708(2) and 2-706 would become the aggrieved seller's residuary remedy. This argument ignores the fact that to recover under 2-708(2), a seller must first establish its status as a lost volume seller. See infra p. 684.
 The district court also concluded that a lost volume seller cannot recover its lost profit under 2-708(2) because such a result would negate a seller's duty to mitigate damages. This position fails to recognize the fact that, by definition, a lost volume seller cannot mitigate damages through resale. Resale does not reduce a lost volume seller's damages because the breach has still resulted in its losing one sale and a corresponding profit. See Autonumerics, 144 Ariz. at 192, 696 P.2d at 1341.
 
 
 [8]
 Supra p. 680
 
 
 [9]
 There is some debate in the commentaries about whether a seller who has resold the goods may ignore the measure of damages provided in 2-706 and elect to proceed under 2-708(1). Under some circumstances the contract-market price differential will result in overcompensating such a seller. See J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code Sec. 7-7, at 271-73 (2d ed. 1980); Sebert, Remedies under Article Two of the Uniform Commercial Code: An Agenda for Review, 130 U.Pa.L.Rev. 360, 380-83 (1981). We need not struggle with this question here because Diasonics has not sought to recover damages under 2-708(1)
 
 
 [10]
 This is also the position adopted by those courts that have held that a lost volume seller can recover its lost profits under 2-708(2). See, e.g., Snyder, 38 Md.App. at 153-54, 380 A.2d at 624-25
 
 
 [11]
 See, e.g., Great Western Sugar Co. v. Mrs. Allison's Cookie Co., 563 F.Supp. 430, 433 n. 1 (E.D.Mo.1983); Distribu-Dor, Inc. v. Karadanis, 11 Cal.App.3d 463, 470, 90 Cal.Rptr. 231, 236 (3d Dist.1970); see also W. Hawkland, Sales and Bulk Sales 153 (2d ed. 1958)
 
 
 [12]
 See, e.g., Comeq, 456 So.2d at 268-69; National Controls, 163 Cal.App.3d at 697, 209 Cal.Rptr. at 642; see also Harris, supra p. 682, at 82-83
 
 
 [13]
 According to one commentator,
 Resale results in loss of volume only if three conditions are met: (1) the person who bought the resold entity would have been solicited by plaintiff had there been no breach and resale; (2) the solicitation would have been successful; and (3) the plaintiff could have performed that additional contract.
 Harris, supra p. 682, at 82 (footnotes omitted).
 
 
 [14]
 As some commentators have pointed out, the cost of calculating a loss of profit may be very high. Goetz & Scott, supra, at 353 ("the complexity of the lost-volume problem suggests that the information costs of exposing an overcompensatory rule are relatively high")
 
 
 [15]
 In explaining its recommendation that 2-708 be amended to include the requirement that due credit be given for resale, the Enlarged Editorial Board stated that its purpose was "to clarify the privilege of the seller to realize junk value when it is manifestly useless to complete the operation of manufacture." Supplement No. 1 to the 1952 Official Draft (1955), quoted in Harris, supra p. 682, at 98
 
 
 [16]
 See supra p. 683 n. 13; see also Schlosser, Damages for the Lost-Volume Seller: Does an Efficient Formula Already Exist? 17 U.C.C.L.J. 238, 245 & n. 20 (1985); Sebert, supra p. 683 n. 9, at 387-88
 
 
 [17]
 See also Restatement (Second) of Torts Sec. 766, comment j, at 12, which states, in pertinent part:
 [Liability may be found in situations] in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.
 The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper. If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.
 (emphasis added); id. Sec. 766, comment h, at 11:
 The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.
 
 
 [18]
 The third-party defendants also requested that we remand this case to the district court for the imposition of sanctions under Rule 11 of the Federal Rules of Civil Procedure and under 28 U.S.C. Sec. 1927. We decline to direct the district court to sanction Diasonics because there is no basis for such action