[No. 20907-1-II.    Division Two.    February 26, 1999.]

KENCO HOMES, INC., *Appellant*, v. DALE E. WILLIAMS, ET
AL., *Respondents*.

*Roger J. Sharp* of *The Sharp Law Firm*, for appellant.
*Alfred A. Bennett*, for respondents.

MORGAN, J. — Kenco Homes, Inc., sued Dale E. Williams and Debi A. Williams, husband and wife,[1] for breaching a contract to purchase a mobile home. After a bench trial, the trial court ruled primarily for Williams. Kenco appealed, claiming the trial court used an incorrect measure of damages. We reverse.

Kenco buys mobile homes from the factory and sells them

---

[1]For convenience, we hereafter refer only to Dale.

to the public. Sometimes, it contracts to sell a home that the factory has not yet built. It has "a virtually unlimited supply of product,"[2] according to the trial court's finding of fact.

On September 27, 1994, Kenco and Williams signed a written contract whereby Kenco agreed to sell, and Williams agreed to buy, a mobile home that Kenco had not yet ordered from the factory. The contract called for a price of $39,400, with $500 down.

The contract contained two conditions pertinent here. According to the first, the contract would be enforceable only if Williams could obtain financing. According to the second, the contract would be enforceable only if Williams later approved a bid for site improvements. Financing was to cover the cost of the mobile home and the cost of the land on which the mobile home would be placed.

The contract provided for damages. It stated, "I [Williams] understand that you [Kenco] shall have all the rights of a seller upon breach of contract under the Uniform Commercial Code, except the right to seek and collect 'liquidated damages' under Section 2-718."[3]

The contract provided for reasonable attorney's fees. It stated, "If you prevail in any legal action which you bring against me, or which I bring against you, concerning this contract, I agree to reimburse you for reasonable attorneys' fees, court costs and expenses."[4]

In early October, Williams accepted Kenco's bid for site improvements. As a result, the parties (a) formed a second contract and (b) fulfilled the first contract's site-improvement-approval condition.[5] Also in early October, Williams received preliminary approval on the needed financing.

---

[2] Clerk's Papers at 12.

[3] Exhibit 1, at 2.

[4] Exhibit 1, at 2.

[5] Both parties assume that this second contract was governed by the UNIFORM COMMERCIAL CODE to the same extent as their first contract. Accordingly, we assume likewise.

On or about October 12, Williams gave Kenco a $600 check so Kenco could order an appraisal of the land on which the mobile home would be located. Before Kenco could act, however, Williams stopped payment on the check and repudiated the entire transaction. His reason, according to the trial court's finding of fact, was that he "had found a better deal elsewhere."[6]

When Williams repudiated, Kenco had not yet ordered the mobile home from the factory. After Williams repudiated, Kenco simply did not place the order. As a result, Kenco's only out-of-pocket expense was a minor amount of office overhead.

On November 1, 1994, Kenco sued Williams for lost profits. After a bench trial, the superior court found that Williams had breached the contract; that Kenco was entitled to damages; and that Kenco had lost profits in the amount of $11,133 ($6,720 on the mobile home, and $4,413 on the site improvements). The court further found, however, that Kenco would be adequately compensated by retaining Williams' $500 down payment[7]; that Williams was the prevailing party; and that Williams should receive reasonable attorney's fees in the amount of $1,800. Because Kenco had already received its $500, the court entered an $1,800 judgment for Williams, and Kenco filed this appeal.

In this court, Williams does not contest the trial court's finding that he breached the contract.[8] Thus, the only issues are (1) whether the superior court used the correct

---

[6]Clerk's Papers at 12.

[7]Kenco argues at length that the trial court viewed this $500 as "liquidated damages," and awarded it to the exclusion of other, compensatory damages. The trial court's written and oral manifestations show, however, that the court intended the $500 to be compensatory damages, not liquidated damages, notwithstanding an apparent misstatement in the second sentence of Finding of Fact 16. It follows that liquidated damages are not an issue in this case.

[8]The trial court so found, and Williams does not assail its finding.

measure of damages, and (2) whether the superior court properly awarded attorneys' fees to Williams.

## I.

██ ██ Under the UNIFORM COMMERCIAL CODE (UCC), a non-breaching seller may recover "damages for non-acceptance" from a breaching buyer.[9] The measure of such damages is as follows:

> (1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (RCW 62A.2-723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (RCW 62A.2-710), but less expenses saved in consequence of the buyer's breach.

> (2) *If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done* then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (RCW 62A.2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.[10]

As the italicized words demonstrate, the statute's purpose is to put the nonbreaching seller in the position that he or she would have occupied if the breaching buyer had fully performed (or, in alternative terms, to give the nonbreaching seller the benefit of his or her bargain).[11] A party claiming damages under subsection (2) bears the burden of show-

---

[9]RCW 62A.2-703(e).

[10]RCW 62A.2-708 (emphasis added).

[11]*See also* RCW 62A.1-106(1).

ing that an award of damages under subsection (1) would be inadequate.[12]

■ In general, the adequacy of damages under subsection (1) depends on whether the nonbreaching seller has a readily available market on which he or she can resell the goods that the breaching buyer should have taken.[13] When a buyer breaches before either side has begun to perform, the amount needed to give the seller the benefit of his or her bargain is the difference between the contract price and the seller's expected cost of performance. Using market price, this difference can, in turn, be subdivided into two smaller differences: (a) the difference between the contract price and the market price, and (b) the difference between the market price and the seller's expected cost of performance. So long as a nonbreaching seller can reasonably resell the breached goods on the open market, he or she can recover the difference between contract price and market price by invoking subsection (1), and the difference between market price and his or her expected cost of performance by reselling the breached goods on the open market. Thus, he or she is made whole by subsection (1), and subsection (1) damages should be deemed "adequate." But if a nonbreaching seller cannot reasonably resell the breached goods on the open market, he or she cannot recover, merely by invoking subsection (1), the difference between market price and his or her expected cost of performance. Hence, he or she is not made whole by subsection (1); subsection (1) damages are "inadequate to put the seller in as good a position as performance would have done"; and subsection (2) comes into play.

---

[12]*R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 684 (7th Cir. 1987); *see also Bill's Coal Co. v. Board of Pub. Utils.*, 887 F.2d 242, 245 (10th Cir. 1989); *Vanderwerff Implement, Inc. v. McCance*, 561 N.W.2d 24, 26 (S.D. 1997); *National Controls, Inc. v. Commodore Bus. Mach., Inc.*, 163 Cal. App. 3d 688, 697, 209 Cal. Rptr. 636 (1985); *Lake Erie Boat Sales, Inc. v. Johnson*, 11 Ohio App. 3d 55, 463 N.E.2d 70, 73 (1983); *Snyder v. Herbert Greenbaum & Assocs., Inc.*, 38 Md. App. 144, 380 A.2d 618, 626 (1977); 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE, § 7-13 at 400 (4th Ed. 1995).

[13]*See James Mfg. Co. v. Stovner*, 1 Wn. App. 27, 31, 459 P.2d 51 (1969) (construing UNIFORM SALES ACT).

The cases illustrate at least three specific situations in which a nonbreaching seller cannot reasonably resell on the open market. In the first, the seller never comes into possession of the breached goods; although he or she plans to acquire such goods before the buyer's breach, he or she rightfully elects not to acquire them after the buyer's breach.[14] In the second, the seller possesses some or all of the breached goods, but they are of such an odd or peculiar nature that the seller lacks a postbreach market on which to sell them; they are, for example, unfinished, obsolete, or highly specialized.[15] In the third situation, the seller again possesses some or all of the breached goods, but because the market is already oversupplied with such goods (i.e., the available supply exceeds demand), he or she cannot resell the breached goods without displacing another sale.[16] Frequently, these sellers are labelled "jobber," "components seller," and "lost volume seller," respectively[17]; in our view, however, such labels confuse more than clarify.

To illustrate the first situation, we examine *Copymate*

---

[14]*Copymate Marketing, Ltd. v. Modern Merchandising, Inc.*, 34 Wn. App. 300, 660 P.2d 332 (1983); *Nobs Chem., U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212 (5th Cir. 1980); *Blair Int'l, Ltd. v. LaBarge, Inc.*, 675 F.2d 954 (8th Cir. 1982); *see* RCW 62A.2-704(2).

[15]*Copymate*, 34 Wn. App. 300; *Coast Trading Co. v. Parmac, Inc.*, 21 Wn. App. 896, 909 n. 5, 587 P.2d 1071, 1079 n. 5 (1978).

[16]*R.E. Davis Chem. Corp.*, 826 F.2d 678; *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279 (9th Cir.1985), *cert. dismissed*, 479 U.S. 957, 107 S. Ct. 450, 93 L. Ed. 2d 397 (1986) (applying Washington law); *Teradyne, Inc. v. Teledyne Indus., Inc.*, 676 F.2d 865 (1st Cir. 1982); *Nederlandse Draadindustrie NDI B.V. v. Grand Pre-Stressed Corp.*, 466 F. Supp. 846 (E.D. N.Y. 1979); *Autonumerics, Inc. v. Bayer Indus., Inc.*, 144 Ariz. 181, 696 P.2d 1330 (Ct. App. 1984); *Unique Designs, Inc. v. Pittard Mach. Co.*, 200 Ga. App. 647, 409 S.E.2d 241, 243 (1991); *Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 285 N.E.2d 311 (1972); *Vanderwerff*, 561 N.W.2d at 25. In passing, we observe that this lost volume situation can be described in several ways. Focusing on the breached unit, one can say that due to a market in which supply exceeds demand, the lost volume seller cannot resell the breached unit without sacrificing an additional sale. Focusing on the additional unit, one can say that but for the buyer's breach, the lost volume seller would have made an additional sale. Focusing on both units, one can say that but for the buyer's breach, the lost volume seller would have sold both units. Each statement is equivalent to the others.

[17]*E.g.*, WHITE & SUMMERS at 384, 387, 389, 398.

*Marketing v. Modern Merchandising, Inc.,*[18] a case cited and discussed by both parties. In that case, Copymate had an option to purchase three thousand copiers from Dowling for $51,750. Before Copymate had exercised its option, it contracted to sell the copiers to Modern for $165,000. It also promised Modern that it would spend $47,350 for advertising that would benefit Modern. It told Dowling it was exercising its option, but before it could finish its purchase from Dowling, Modern repudiated. Acting with commercial reasonableness, Copymate responded by cancelling its deal with Dowling and never acquiring the copiers. It then sued Modern for its lost profits and prevailed in the trial court. Modern appealed, but this court affirmed. Because Copymate had rightfully elected not to acquire the copiers, it had no way to resell them on the open market; subsection (1) was inadequate; and subsection (2) applied. Thus, Copymate recovered its contract price with Modern ($165,000), minus the expected cost of performing its contract with Modern ($51,750 for Dowling, $47,350 for advertising, and $180 for a miscellaneous import fee), for a total of $65,720.

To illustrate the second situation, we again examine *Copymate*. Based on substantial evidence, the *Copymate* trial court found that after Modern's repudiation, Copymate had "no active or reasonably available market for the resale of the . . . copiers."[19] One reason was that the copiers had been in storage in Canada for nine years; thus, they seem to have been obsolete. Again, then, Copymate could not resell the copiers on the open market; subsection (1) was inadequate; and subsection (2) provided for an award of "lost profits."

To illustrate the third situation, we examine *R.E. Davis Chem. Corp. v. Diasonics, Inc.*[20] In that case, Davis breached his contract to buy medical equipment from Diasonics. Dia-

---

[18] 34 Wn. App. 300, 660 P.2d 332 (1983).

[19] 34 Wn. App. at 302.

[20] 826 F.2d 678.

sonics was in possession of the equipment, which it soon resold on the open market. Diasonics then sued Davis for "lost profits" under subsection (2), arguing that "it was a 'lost volume seller,' and, as such, it lost the profit from one sale when Davis breached its contract."[21] The trial court granted summary judgment to Davis, but the appellate court reversed and remanded for trial. Other courts, the appellate court noted, "have defined a lost volume seller as one that has a predictable and finite number of customers and that has the capacity either to sell to all new buyers or to make the one additional sale represented by the resale after the breach."[22] This definition, the appellate court ruled, lacks an essential element: whether the seller *would* have sold an additional unit but for the buyer's breach.[23] On remand, then, Diasonics would have to prove (a) that it *could* have produced and sold the breached unit in addition to its actual volume, and (b) that it *would* have produced and sold the breached unit in addition to its actual volume.[24]

In this case, Kenco did not order the breached goods before Williams repudiated. After Williams repudiated, Kenco was not required to order the breached goods from the factory[25]; it rightfully elected not to do so; and it could not resell the breached goods on the open market. Here,

---

[21]826 F.2d at 680.

[22]826 F.2d at 683. In essence, then, these courts hold that a lost volume seller is one who proves at trial that his or her supply of product exceeds the demand for such product on the relevant market.

[23]826 F.2d at 684; *accord*, WHITE & SUMMERS, § 7-9, at 386.

[24]826 F.2d at 684; *accord*, WHITE & SUMMERS, § 7-9, at 386.

[25]RCW 62A.2-703; RCW 62A.2-704(2). Washington's common law is to the same effect. *See Wallace Real Estate Inv., Inc. v. Groves*, 124 Wn.2d 881, 898, 881 P.2d 1010 (1994) (seller's performance excused by buyer's anticipated breach); *CKP, Inc. v. GRS Constr. Co.*, 63 Wn. App. 601, 620, 821 P.2d 63 (1991), *review denied*, 120 Wn.2d 1010, 841 P.2d 47 (1992) ("Repudiation of a contract by one party may be treated by the other as a breach which will excuse the other's performance"); *Turner v. Gunderson*, 60 Wn. App. 696, 703, 807 P.2d 370 (1991) ("Unless justified, repudiation by one party will excuse performance by the injured party."); *Hemisphere Loggers & Contractors, Inc. v. Everett Plywood Corp.*, 7 Wn. App. 232, 234, 499 P.2d 85, *review denied*, 81 Wn.2d 1007 (1972) ("Repudiation of a contract by one party may be treated by the injured party as a

then, "the measure of damages provided in subsection (1) is inadequate to put [Kenco] in as good a position as [Williams'] performance would have done"[26]; subsection (2) states the applicable measure of damages; and Kenco is entitled to its lost profit of $11,133.

## II.

The second issue is whether Kenco is entitled to reasonable attorneys fees. The parties' contract provided that the prevailing party would be entitled to such fees. Kenco is the prevailing party. On remand, the trial court shall award Kenco reasonable attorneys' fees incurred at trial and on appeal.

Reversed with directions to enter an amended judgment awarding Kenco its lost profit of $11,133, reasonable attorneys' fees incurred at trial and on appeal, and any ancillary amounts required by law.

BRIDGEWATER, C.J., and SEINFELD, J., concur.

Reconsideration denied May 3, 1999.

---

breach which will excuse his own performance."); *Refrigeration Eng'g Co. v. McKay*, 4 Wn. App. 963, 967, 486 P.2d 304 (1971).

[26]RCW 62A.2-708(2).