**AERO CONSULTING CORPORATION, Plaintiff,**

**v.**

**The CESSNA AIRCRAFT COMPANY, Defendant.**

**No. 92–1192–WEB.**

United States District Court, D. Kansas.

Oct. 6, 1994.

Scott J. Gunderson, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for plaintiff.

Ronald P. Williams and John C. Nettels, Jr., Victor S. Nelson, Morrison & Hecker, Wichita, KS, for defendant.

## *MEMORANDUM AND ORDER*

WESLEY E. BROWN, Senior District Judge.

This contract action came before the court for a jury trial. At the close of the evidence,

the defendant moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The court granted the defendant's motion and made oral findings from the bench in support of the ruling. (Pursuant to the court's oral rulings, the clerk entered judgment in favor of the defendant. The judgment was entered on the docket on September 13, 1994.) This written memorandum will serve to supplement the court's ruling from the bench.

A. *Nature of the Action.*

The dispute arose out of an agreement between Aero Consulting Corporation ("Aero") and The Cessna Aircraft Company ("Cessna"). Pursuant to a written purchase agreement dated September 7, 1989, Aero agreed to purchase a Cessna Model 560 "Citation V" business jet from Cessna. When the date for delivery arrived, Aero representative Ricardo Morales presented a check for the aircraft that was approximately $219,000 less than the purchase price listed in the purchase agreement. Mr. Morales contended that he should be allowed to deduct from the purchase price a portion of commission that he believed he was entitled to for the sale of the airplane. Cessna refused to accept less than the purchase price specified in the purchase agreement and refused Mr. Morales' offer to place the $219,000 in escrow if Cessna would guarantee that he would receive the commission. When Aero did not make full payment by the date specified in the parties' agreement, Cessna notified Aero that it considered Aero to be in default and, pursuant to the purchase agreement, retained as liquidated damages deposits previously made by Aero in the amount of $425,000. Aero then filed this diversity action seeking to recover the $425,000 plus interest.

B. *Facts.*

Based upon the evidence presented, the court found the following facts to be undisputed. This statement of facts is intended to be a general summary; it is not intended as an exclusive or exhaustive statement of the facts upon which the decision of the court was based.

The evidence disclosed that Cessna, in order to facilitate sales of its planes into foreign countries, has established a standard form agreement for what it terms "Authorized Export Sales Representatives," or "AESR's." Pursuant to these agreements, Cessna authorizes an AESR to act on its behalf in selling Cessna aircraft within a designated geographical area. In return, Cessna agrees to pay a commission to the AESR after an aircraft has been delivered to a retail user within the AESR's area upon an order secured by the AESR.

One such AESR agreement was between Cessna and a Venezuelan company named Aereotuy, C.A. (Def.Exh. 9). The agreement was entered into on behalf of Aereotuy by its president, Peter Bottome. Pursuant to the terms of the agreement, Aereotuy was designated as Cessna's authorized representative in Venezuela. In the agreement, Aereotuy stated that it:

> understands and agrees that commissions shall only be paid on orders secured by REPRESENTATIVE if the CITATION aircraft are actually delivered to retail users located in the Area and payment to Cessna is received. Should there be no such delivery or payment on any such orders for any reason, including action or inaction on the part of Cessna, no commissions shall be due from Cessna. Commissions shall be paid to REPRESENTATIVE thirty (30) days after such delivery.

(Def.Exh. 9, Art. IV, C.). The agreement further stated that "Upon acceptance by CESSNA, such orders shall become binding Purchase Agreements between CESSNA and the retail user (purchaser) and REPRESENTATIVE shall have no rights or obligations thereunder." *Id.* at A. Aereotuy also agreed that it would not assign the Agreement or any rights thereunder without the prior written approval of Cessna. *Id.*, Art. II, A(7).

Ricardo Morales, a resident of Caracas, Venezuela, was interested in brokering sales of Cessna aircraft. Morales testified that representatives of Cessna inquired of him if he would like to become Cessna's AESR for Venezuela. Morales did not replace Aereotuy as Cessna's AESR, however. Instead, in

1987, on behalf of his company, Richair, S.R.L., he entered into an agreement with Aereotuy relating to sales of Cessna aircraft in Venezuela. Pl.Exh. 61. This agreement recognized that Aereotuy was an authorized distributor of Cessna aircraft in Venezuela by virtue of its contract with Cessna. It further stated that Aereotuy was authorized to assign a "Retailer Concessionary" for Cessna sales in Venezuela and stated that Aereotuy was designating Richair as a retailer concessionary. Under their agreement, Aereotuy, as "LA REPRESENTANTE," and Richair, as "LA CONCESIONARIA," agreed that if Richair sold a new aircraft for delivery into Venezuela they would split the net commission from Cessna, with fifty per cent going to Aereotuy and fifty per cent to Richair. The agreement further provided that it could be terminated by either party. Mr. Morales testified that this agreement was submitted to a representative of Cessna. Mr. Morales's testimony established that he understood that under Cessna's AESR agreement with Aereotuy any commissions earned would be paid by Cessna to Aereotuy because Aereotuy was Cessna's AESR for Venezuela. Under the above-mentioned agreement between Aereotuy and Richair, Morales would then receive his commission from Aereotuy. This pattern was apparently followed on several Citation aircraft sold by Morales in Venezuela between 1987 and 1991.[1]

Mr. Morales' testimony indicated that his sales activities in Venezuela were often undertaken under the company name of William C. Morales & CIA, C.A. In September of 1989, at Mr. Morales' request, Cessna's regional manager for South America issued a letter certifying that "the company WILLIAM C. MORALES & CIA, of Caracas, Venezuela, under the direction of Mr. Ricardo Morales, President, are the authorized sales organization for CESSNA AIRCRAFT COMPANY in joint operation with AEREOTUY/AEROPOTOCO for Service and Maintenance." Pl.Exh. 54. The letter further stated that "Mr. Ricardo Morales is fully authorized to negotiate Purchase Agreements for CESSNA/CITATION aircraft and to accept and forward to CESSNA AIRCRAFT COMPANY any sales contracts, deposits, or other payments." *Id.*

On September 7, 1989, a Purchase Agreement for a Cessna Citation V (production unit 109) was entered into between Ricardo Morales, as president of Richair, and Cessna. Pl.Exh. 1. Pursuant to the terms of the purchase agreement, the base price of the aircraft was $3,995,000. *Id.* Charges for optional equipment were to be furnished; such equipment was to be specified nine months prior to scheduled delivery. A preliminary delivery date of April, 1991 was set forth. The seller agreed that it would establish a scheduled delivery date nine months prior to the preliminary date and would notify the purchaser thereof. The payment terms called for an initial deposit by the purchaser of $125,000, an additional deposit of $300,000 due six months prior to the scheduled delivery date, with the balance due upon delivery. The total purchase price, which was to be furnished, was to be adjusted based on a factor tied to the Consumer Price Index. Under the agreement, the purchaser also agreed:

> 3. Except as set forth in Section IV, Paragraph 5, in the event this Agreement is cancelled or terminated by Purchaser for any cause whatsoever, including Purchaser's failure to pay the balance on the aircraft and other charges under this Agreement when due, Seller shall retain, not as a forfeiture but as liquidated damages for default, all cash deposits theretofore made by Purchaser pursuant to Section III, Paragraphs 1 and 2 above; whereupon this Agreement shall end.
>
> * * * * * *
>
> 6. Within seven (7) days after the Ready-for-Delivery Date, to accept delivery of the Aircraft at Wichita, Kansas, and to pay Seller the balance due on the Aircraft and all other charges due under this Agreement (less appropriate credit for trade-in aircraft where applicable.) In all events, the full balance due upon the Aircraft and all other charges shall be paid no

1. There was also some evidence suggesting that in some transactions Aereotuy may have authorized Cessna to pay a portion of a sales commission directly to Richair.

later than seven (7) days following the Ready-for-Delivery Date or upon delivery of the Aircraft, whichever first occurs.

* * * * * *

Pl.Exh. 1. The Purchase Agreement also provided that, prior to acceptance by the purchaser, the aircraft would be subject to inspection and made available for a test flight. The agreement further provided:

> 9. This Agreement is the only agreement controlling this purchase and sale, express or implied, either verbal or in writing, and is binding on Purchaser and Seller.... * * * Purchaser acknowledges receipt of a written copy of this Agreement which may not be modified in any way except by written agreement executed by both parties.

*Id.*

Effective September 25, 1990, Morales and Cessna executed a written change order to the Purchase Agreement. Under this "Change No. 1," the parties changed the production unit from number 109 to a later unit, unit number 161, and set a new delivery date of December, 1991. (Pl.Exh. 1A). The due date for the additional deposit of $300,000 was changed to June of 1991. All other terms of the original Purchase Order remained the same.

In January of 1991, Peter Bottome wrote Ricardo Morales and informed Morales that, pursuant to the cancellation provision in the agreement between Aereotuy and Richair, he was canceling that agreement. At trial, Mr. Morales testified that under his agreement with Aereotuy he was entitled under the contract to receive from Aereotuy his share of commissions for sales that were lined up before the cancellation. The English translation of the agreement seems to support this view: "If, before these thirty (30) days [the notification period for cancellation], there may be a negotiation pending with a received deposit before its expiration, this negotiation will be recognized by [Aereotuy] or a designated document [sic] or upon receiving the total payment or a signed financial accredited agreement or an agreement that allows the formal delivery of the aircraft to the buyer." Def.Exh. 15.

Mr. Morales' testimony indicated that he initially had a potential purchaser lined up for unit 161 but the individual decided not to buy it. Prior to the time the $300,000 deposit became due on the aircraft, Morales had some discussion with Cessna concerning whether he would go ahead with the purchase or cancel it. Morales indicated to Cessna at that time that he would release the aircraft only if his initial deposit was refunded. Def.Exh. 17. Otherwise, he would go ahead with the purchase himself with the expectation that he could line up another purchaser for the aircraft or lease it out in the future. *Id.* He also indicated that he expected to receive a sales commission if the plane were sold into Venezuela. On April 30, 1991, Ursula Jarvis of Cessna wrote Mr. Morales a letter in which she indicated that Cessna would not agree to return Mr. Morales' initial deposit. She also stated in the letter: "You mention something about commission if the aircraft is sold for use in Venezuela. As you are well aware, our representation is with Peter Bottome's organization, not with you. Therefore there will be *no* commission for you from Cessna on the sale of this aircraft." Def.Exh. 10 (emphasis in original). On July 10, 1991, Morales made the required $300,000 deposit towards the purchase of the aircraft.

Effective July 12, 1991, Morales and Cessna executed written "Change No. 2" to the Purchase Agreement. *See* Pl.Exh. 1B. This change order specified the type and price of the optional equipment requested by Mr. Morales. The change order also calculated and set forth the total purchase price of the aircraft as $4,557,900.

Effective July 18, 1991, Morales and Cessna executed written "Change No. 3" to the Purchase Agreement. Pl.Exh. 1C. Change No. 3 deleted Morales and Richair as the purchaser and substituted Aero Consulting Corporation, with Aero assuming all liabilities and obligations under the Purchase Agreement. Mr. Morales was authorized to act as agent for Aero in connection with the purchase.

Effective July 26, 1991, Morales and Cessna executed written "Change No. 4" to the

Purchase Agreement.[2] Pl.Exh. 1D. In addition to certain other interior specifications, this document identified the following change: "Interior/Exterior Specification Revision 'A' (Copy Attached)." Revision A lists the interior specifications, including all options selections, and contains diagrams showing the location and style of seats, the installation of fabrics, carpets, hardware and cabinets selected for the aircraft. Mr. Morales testified at trial that Revision A was not attached to Change No. 4 when he received it.

Effective December 16, 1991, Morales and Cessna executed written "Change No. 5" to the Purchase Agreement. Pl.Exh. 1E. Change No. 5 revised the delivery date of the aircraft from December, 1991 to January, 1992.

On December 11, 1991, Ursula Jarvis of Cessna sent Mr. Morales a letter. Def.Exh. 4. In the letter she noted that Cessna had been notified by Peter Bottome that Morales was preparing to pay the balance due on unit 161 exclusive of the commission amount. She pointed out that Cessna's policy was to receive full payment and to pay any commissions due thirty days after delivery of the aircraft to a retail customer in the AESR area of responsibility. She also pointed out that "since you are not Cessna's AESR, no commission is due you on the sale whatsoever." *Id.* The letter further informed Mr. Morales that the aircraft Ready-for-Delivery date was January 13, 1992, and that the contract called for acceptance and payment for the aircraft within seven days of that date.

At trial, Ms. Jarvis testified that to some extent Cessna has allowed retail purchasers to "net" commissions out of the final purchase price. She testified that the determination of whether this would be done was made on a case by case basis.

On December 12, 1991, Cessna sent an invoice to Aero showing that the total for the aircraft, after subtraction of deposits, amounted to $4,135,800. The terms were identified as "cash." Def.Exh. 7.

On December 13, 1991, Morales wrote Peter Bottome concerning a proposal regarding payment for the aircraft. Def.Exh. 2. The letter noted that the amount expected by the factory for the aircraft was $4,135,800. It also pointed out that the difference between this amount and the amount that Aero Consulting would pay was $239,256. The letter further indicated that after payment the factory would later return $319,256, which represented a seven per cent sales commission on the plane. The letter proposed that Aereotuy finance this difference of $239,256 "because it is Aereotuy that will receive this amount plus its dividend." Otherwise, Morales noted, he would be forced to solicit additional financing for this amount.

On December 16, 1991, Peter Bottome wrote Mr. Morales in response to his correspondence. Def.Exh. 3. Bottome stated simply that it was Cessna's policy to receive full payment for the airplane and to pay any commission thirty days after the aircraft had been delivered to the client in the responsibility area of the AESR.

On January 10, 1992, Ursula Jarvis wrote Morales and again stated that payment had to be made in full and that payment exclusive of commission was not permitted. Def.Exh. 11. She also stated: "Additionally, I point out again that our AESR Agreement is with Airtech and any commission, if the sale qualifies under the AESR Agreement, will be paid to Airtech per the terms and conditions of the Agreement.... Any claim that you have will need to be worked out between you and Airtech. No exceptions to the rule will be made." The testimony at trial indicated that Airtech was a company established by Peter Bottome after he canceled the contract between Aereotuy and Morales' company, Richair. Airtech had apparently signed a new AESR agreement with Cessna by this time. A copy of the letter was sent to Peter Bottome.

On January 15, 1992, Peter Bottome faxed a letter to Ursula Jarvis in which he noted that in her letter of January 10, Jarvis had

2. The plaintiff initially asserted in pretrial proceedings that he had not signed Change No. 4. That assertion was withdrawn at a pretrial hearing after Cessna produced a copy of the change order bearing Mr. Morales' signature.

stated that the commission on unit 161, if and when due, would be paid to Airtech. Pl.Exh. 70. He stated that he believed that the commission should be paid to Aereotuy because it was the AESR at the time of that sale. He noted that Morales was "understandably concerned that Aereotuy will not be able to comply with their agreement with him if they do not receive the commission." Bottome suggested that Jarvis send Morales a fax clearing up this point.

On January 16, 1992, Morales faxed Peter Bottome a letter in which he asked Bottome to write a letter to Ursula Jarvis authorizing Cessna to withhold $219,256 "from commission payment to AESR to apply towards full payment of" $4,560,800. Def.Exh. 6. No response was received from Peter Bottome on this request.

On January 17, 1992, Mr. Morales came to the Cessna offices in Wichita, Kansas, for the ostensible purpose of making payment for and accepting delivery of the aircraft. He first met with Ursula Jarvis of Cessna. The exact content of their discussion is not entirely clear from the testimony presented at trial. Certain facts are undisputed, however. Morales informed Ms. Jarvis that he was there to make arrangements for acceptance of the aircraft. When Ms. Jarvis asked Mr. Morales if he was prepared to make payment, he produced a check made out to Cessna in the amount of $3,916,544. The check was approximately $219,000 short of the total balance due on the aircraft. Mr. Morales indicated that this difference was the amount of the commission to which he believed he was entitled for the sale of the plane. Ms. Jarvis refused to accept the check. She told Morales that the check was $219,000 short and that he had to make full payment of the balance due. She told him that he could not make payment exclusive of the sales commission. Jarvis indicated that Airtech was the AESR for Venezuela and that, if a commission was payable, it would be made to Airtech.[3] Jarvis told Morales that if he did not pay the full amount his deposits would be liquidated. Mr. Morales indicated that he did not want to have to get his share of the commission from Peter Bottome, whom Morales believed had been disloyal. Mr. Morales offered to make payment of the $219,000 if the money were placed in an escrow account with assurance by Cessna that he would receive it back when Cessna paid the sales commission on the aircraft. He also offered to write a check for the $219,000 if Cessna would issue a "credit memo" in his favor for a portion of the sales commission. Ms. Jarvis made clear that she would not accept such a payment if conditions such as those stated by Mr. Morales were placed on it. An impasse was reached, at which point Mr. Morales stated that he wanted to talk to Gary Hay and Gordon Vieth, who were employed in Cessna's sales department. Mr. Morales met with Hay and Vieth and a similar discussion took place, with Mr. Morales again offering to make the payment if the money were placed in escrow. The offer was again rejected. The meeting ended and Mr. Morales left the offices. He went to Cessna's delivery center and examined the aircraft.

Through cross-examination of Mr. Morales at trial, the defendants brought the fact that Mr. Morales was accompanied at these meetings in Wichita by a lawyer from Mexico who represented a Mexican resident named Carlos Alleman. Although Mr. Morales' testimony was somewhat vague on this subject, it is incontrovertible from his testimony that Mr. Morales at that time was at least entertaining the possibility of selling unit 161 to Carlos Alleman in Mexico. If such a sale had taken place, the commission on the plane would have been payable to the AESR for Mexico. Mr. Morales testified that he had met with the AESR for Mexico in September of 1991 to discuss the possibility of splitting the commission for the sale of the plane.

Under the terms of the Purchase Agreement, Aero had seven days from the Ready-

3. Jarvis testified that she believed that after receiving Bottome's fax of January 15, 1991, she told Morales at their meeting on January 17th that Aereotuy rather than Airtech would be entitled to a commission on the sale of unit 161. Mr. Morales' testimony indicated that during their January 17th meeting Ms. Jarvis insisted that Airtech would receive any commission. Because this matter came before the court on the defendant's motion for judgment as a matter of law, the court assumes that the plaintiff's version of the facts is true.

for-Delivery date of January 13, 1992, to pay the balance due on the aircraft. Mr. Morales left Wichita without making any further arrangements regarding payment. On January 20, 1992, Mr. Morales' agent sent a fax on his behalf to Leslie Jenning, who was Cessna's contract administrator for this agreement. The fax stated in pertinent part:

> Dear Leslie:
>
> I was recently at the factory and I am sorry that I missed you, and wished I could say Hello.
>
> In regards to the interior of this aircraft, we feel that it needs to be checked for specification error.
>
> The specification observations are the following:
>
> The ceiling is not the ultrasuede
>
> The seat trim is not of the horizontal design type
>
> Enclosed is the correspondence that we faxed to you with the specifications of the interior. We asked for the ultrasuede headliner and the aircraft has installed the Eurostretch.
>
> Also, the seat pattern might have been of the wrong design, and we are checking our files as we do not usually specify vertical trim inserts.
>
> Leslie, could you please verify this and let me know how long it would take to correct.

Pl.Exh. 40.

On January 21, 1992, Mick Hoveskeland of Cessna mailed and faxed a letter to Morales. Def.Exh. 26. The letter stated in pertinent part:

> Further to our telephone call of January 20, 1992, I have spoken with Gary Hay concerning your proposed payment for this aircraft. Since your offer was for something less than payment in full it was rejected.
>
> Section II, Paragraph 6 of the Purchase Agreement requires the Purchaser to make payment in full within seven (7) days of the Ready-for-Delivery Date. Since payment has not been received as specified, your Purchase Agreement is in default. We are, therefore, proceeding per Section III, paragraph 3 of the Purchase Agreement whereby all cash deposits are retained by Seller, not as forfeiture, but as liquidated damages for default. The aircraft will be resold per K.S.A. 84-2-706.

Def.Exh. 26.

On January 22, 1992, Mr. Morales responded to the letter from Mick Hoveskeland of Cessna. Pl.Exh. 41. He stated in part:

> It is my pleasure to advise you that we have always been more than happy and willing to make full payment on the above referenced aircraft.
>
> Mr. Gary Hay has listened to my fair request that a credit memo be issued as it has in the past, as part of full payment. It [sic] this were not acceptable, I would be more than glad to escrow an amount of two hundred nineteen thousand two hundred fifty six dollars ($219,256.00) to be released to Cessna against same amount being released to me by the Cessna AESR or other appropriate instrument.
>
> On the other hand, in addition to my having visited the Factory in capacity to make full payment, our pilot has been and is presently in Wichita ready to proceed with your Section IV, paragraph II, inspection and flight test. Please advise when this will be convenient for you.

Also on January 22, 1992, Mr. Morales sent a letter to Gary Hay of Cessna. The letter stated in part:

> I have been more than willing from day one, to make full payment on my commitment. Unfortunately, during this time of association with Mr. Bottome, this has been the history of events; I complied with my end of the bargain, he does not, and in turn he convinces the Factory to believe that it is I who is failing to comply. I have told Mr. Bottome from day one, that I am more than willing to put up four million five hundred sixty thousand eight hundred dollars ($4,560,800) with an appropriate escrow account entity, to be released against a free Bill of Sale to Aero Consulting Corporation together with a return of two hundred nineteen thousand two hundred fifty six dollars ($219,256) AESR discount and commission agreed upon this negotiation.

Def.Exh. 27. The letter further requested that the parties find a "marketing solution" to the problems presented.

On January 24, 1992, Mr. Morales sent another letter to Mick Hoveskeland of Cessna. The letter stated in part:

> In reference to our fax of January 22 and pertaining to the Citation V purchase agreement Section IV, paragraph III, regarding inspection and flight test of aircraft.
>
> We have been advised by our pilot representative, that you have not made the aircraft available in order to proceed with this absolutely necessary formality. Therefore, we have no choice but to return our pilot to Miami and we await your new "ready for delivery date".

Pl.Exh. 42.

On January 27, 1992, Hoveskeland responded to Morales' two previous letters. Hoveskeland again stated that the contract was in default because Morales had not offered to make full payment within the time allowed under the terms of the Purchase Agreement. Def.Exh. 56.

On January 30, 1992, Ursula Jarvis faxed Ricardo Morales a letter stating in pertinent part:

> In my letter of January 10, 1992 to you I, incorrectly, made reference to Airtech when talking about the AESR of record for Unit 0161 if it had been sold into Venezuela. This should have said Aerotuy.
>
> During your visit to Wichita on January 17 I thought I made clear in our discussion that the AESR under discussion was Aerotuy.
>
> For the record, I hereby, again, confirm that the AESR originally involved with Unit 0161 was Aerotuy.
>
> This communication is merely to correct a reference in my letter of January 10 and changes nothing with regard to the status of your Purchase Agreement, which is in default.

Pl.Exh. 66.

Cessna retained deposits of $425,000 that had been submitted by or on Aero Consulting's behalf for unit 161. Cessna subsequently modified and resold unit 161 to the Spanish Ministry of Defense. The sale was part of a $10 million "package" that also included the sale of another aircraft.

C. *Conclusions of Law.*

Aero Consulting alleged in this action that Cessna breached the parties' contract by failing to deliver an aircraft incorporating the materials and tailoring specified by Aero and by refusing to allow Aero to perform a customer test flight. Aero further alleged that the liquidated damages clause of the Purchase Agreement did not allow Cessna to retain Aero's deposits because Aero neither "canceled" nor "terminated" the agreement and because the clause is unreasonable, unconscionable, and unenforceable.

Cessna's primary argument in support of its motion for judgment as a matter of law was that Mr. Morales' conduct on January 17, 1992, constituted an anticipatory repudiation of the contract.[4] Alternatively, Cessna argued that Aero breached the contract by failing to pay the balance due on the aircraft by January 21, 1992. Cessna maintained that the aircraft met the interior specifications required by the parties' agreement. Finally, Cessna argued that the liquidated damages clause of the contract was valid and enforceable and that it authorized the liquidation of Aero's deposits.

The court finds that it has jurisdiction of the action under 28 U.S.C. § 1332(a)(1) and that venue is proper in this district. The parties have stipulated that the action is governed by the laws of Kansas.

1. *The Agreement Between the Parties.* Based upon the materials submitted, the court previously determined that the agreement between the parties regarding the pur-

4. At a pretrial conference the day before trial, the court granted Cessna's motion to amend the pretrial order to assert a theory of anticipatory repudiation. The court concluded that the factual basis in support of such a theory had been previously set forth in the pretrial order, that Cessna had not waived the assertion of such a theory, and that Aero would not suffer prejudice from the amendment.

chase and sale of unit 161 consisted of the September 7, 1989, Purchase Agreement, together with the five written change orders that expressly modified that Agreement. The court concluded that the terms of the agreement, including those relating to payment of the balance due, were clear and unambiguous. The court further found that the Purchase Agreement and written change orders were intended by the parties as the final and complete expression of the parties' agreement as to the terms contained therein.[5]

a. *Interior Specifications.* The plaintiff contends that Cessna breached the contract by failing to deliver an aircraft incorporating the materials and tailoring specified by Aero. This argument was based primarily on correspondence from Mr. Morales to Cessna concerning interior specifications. The court previously determined as a matter of law that written "Change No. 4" to the Purchase Agreement was intended by the parties as a final expression of the parties as to interior specifications of the aircraft. As such, the parol evidence rule prohibited the use of prior correspondence that would tend to contradict the terms of the agreement. K.S.A. 84–2–202.

By its terms Change No. 4 indicated clearly that it was adopting "Interior/Exterior Specification Revision 'A' (Copy Attached)." The court determined that Aero was bound by Mr. Morales' execution of Change No. 4 notwithstanding his contention that "Revision A" was not attached to the change order when he signed it. This ruling was in accord with the general rule that it is the duty of every contracting party to learn and know the contents of a contract before signing it. *See e.g., Flight Concepts Ltd. Partnership v. Boeing Co.,* 819 F.Supp. 1535, 1548 (D.Kan.1993); *Vanier v. Ponsoldt,* 251 Kan. 88, 833 P.2d 949 (1992). If Revision A in fact were not attached to the change order provided to Mr. Morales, he had a duty to find out what it contained before he signed a provision making it a part of the contract.

The court further determined that the provisions of Revision A were clear and unambiguous. The meaning of the terms "headliner" and "overhead" was made clear by diagrams contained in Revision A. Revision A showed that the "headliner" portion of the aircraft had been specified as Eurostretch 0301 and that the "overhead" was to be Diagonal Check Ultrasuede No. 039 Oyster. The diagrams therein eliminate as a matter of law Aero's contention that the specification terms agreed to by the parties were ambiguous. It also precludes any finding that there was a mutual mistake as to what the "headliner" consisted of or whether "Eurostretch" fabric had been specified for use in that portion of the aircraft.[6]

In light of the foregoing, the court determined as a matter of law that the evidence presented at trial did not show any nonconformity in the aircraft's specifications. As the defendant has pointed out, the uncontradicted testimony of Ms. Jenning was that the materials used in unit 161 were in fact the materials specified in Revision A. The plaintiff failed to present sufficient evidence from which a reasonable jury could find that the aircraft did not conform to Revision A.

b. *Course of dealing.* The plaintiff also argued that a factual question for the jury was raised as to whether the parties had an agreement, based on a prior course of dealing with Cessna, that Mr. Morales could pay the balance due on the aircraft exclusive of the sales commission he expected to receive. Mr. Morales testified that he was involved in two prior sales transactions in which Cessna

5. The Purchase Agreement did contemplate that certain terms would be specified by written agreement of the parties at a later date. These included certain optional equipment, a calculation of the total purchase price, and the interior and exterior specifications selected. The court concluded that the written change orders executed by the parties represented a final expression of the parties' agreement with respect to those terms.

6. Aero produced no evidence at trial or by way of offer of proof that there was a mutual mistake concerning the interior specifications agreed to by the parties. Rather, Aero's evidence went to whether there was a unilateral mistake on Aero's part. Absent fraud, however, a unilateral mistake will not excuse nonperformance of a contract. *Albers v. Nelson,* 248 Kan. 575, 809 P.2d 1194 (1991).

allowed the purchaser to pay the final balance less a portion of a sales commission. The court concluded that this evidence did not raise a question for the jury. There were several reasons for this conclusion.

As an initial matter, the plaintiff attempted to use evidence of a course of dealing to contradict the unambiguous terms of the written contract. The Purchase Agreement and the change orders clearly set forth the balance due upon delivery of the aircraft and stated that the full balance due should be paid within seven days of the Ready-for-Delivery date. The Purchase Agreement further provided that "All payments shall be made in United States dollars at Wichita, Kansas, U.S.A., and shall be made by certified check, bank cashier's check, irrevocable letter of credit confirmed by a member bank of the U.S. Federal Reserve System, or such other negotiable instruments as may be acceptable to Seller." Plaintiff's reliance upon prior dealing to reduce the amount of the balance due must be viewed as an attempt to contradict either the written term of the balance due or the written terms concerning the acceptable methods of payment. Although evidence of a course of dealing is always admissible to explain or supplement the terms of the parties' final expression of agreement, it may not be used to contradict the terms of such an agreement. K.S.A. § 84–2–202; *Id.* at § 84–1–205(4) (The express terms of an agreement and an applicable course of dealing ... shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control....")

■ The court also agreed with Cessna that the plaintiff failed to produce evidence from which a reasonable jury could conclude that the parties' prior course of dealing formed the basis of an understanding concerning a reduction of the balance due. A course of dealing is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." K.S.A. § 84–1–205(1). Mr. Morales testified that he was involved in two prior transactions in which Cessna had permitted the purchaser to reduce final payment by a portion of a sales commission. He was involved in a total of fourteen purchases from Cessna, however, twelve of which apparently did not involve any reduction of the balance due. The court finds that the evidence failed to establish a course of dealing sufficient to be fairly regarded as a common basis of understanding. *Cf. Kern Oil and Refining Co. v. Tenneco Oil Co.,* 792 F.2d 1380 (9th Cir.1986), *cert. denied,* 480 U.S. 906, 107 S.Ct. 1349, 94 L.Ed.2d 520 (1987) (Single transaction did not constitute "course of dealing" under the UCC). At most, this course of dealing evidence could be said to have demonstrated that in these two prior sales Cessna agreed to modify the payment terms of the written agreement after it had been entered into. No evidence of such an agreement was produced in this case. *Cf. Jon–T Chemicals, Inc. v. Freeport Chemical Co.,* 704 F.2d 1412, 1416 n. 5 (5th Cir.1983) (Prior instances of delivery of contract goods that deviated from the terms of the written agreement did not constitute a "course of dealing" establishing a term of the contract; plaintiff knew that it would have to obtain the agreement of the defendant to deviate from the written contract.)

■ Even if the prior course of dealing cited by the plaintiff could be said to be evidence of additional terms consistent with the written agreement, the court concluded that the parties intended the Purchase Agreement and the written change orders to be a complete and exclusive statement of the terms of their agreement at least with regard to payment. The court recognizes that under the Kansas UCC there is presumption that a writing is not fully integrated. K.S.A. § 84–2–202, Kansas Comment 1983. Nevertheless, a consideration of all of the circumstances leads the court to conclude that the parties could not have intended this prior course of dealing to form an additional term of their contract with regard to payment. First of all, the Purchase Agreement expressly stated that it was "the only agreement controlling this purchase and sale, express or implied, either verbal or in writing...." Def.Exh. 12. It also stated that any modifications to the written agreement

had to be in writing. *Id.* Second, both parties are sophisticated business entities; there is no allegation that the contract is one of adhesion. Third, the type of contract term at issue (relating to payment) does not implicate any public policy considerations against a finding of integration. And fourth, it is highly unlikely that the parties would have entered into an extensive written agreement for the sale of a four and a half million dollar aircraft without including all of the agreed upon terms relating to payment. *See* K.S.A. 84-2-202, Official Comment 1-3 (If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact.). *Cf. Betaco, Inc. v. Cessna Aircraft Company,* 32 F.3d 1126 (7th Cir.1994). In sum, the plaintiff's course of dealing evidence may not properly be used to establish additional contract terms. K.S.A. 84-2-202(b).

2. *Repudiation.* Section 84-2-610 of the Kansas Uniform Commercial Code provides in part that when either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may resort to any remedy for breach and may suspend his own performance. Anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear intention not to continue with performance. *Id.* Official UCC Comment. Repudiation under the Commercial Code does not require a "clear and unequivocal" refusal to perform; any action which "reasonably indicates a rejection of the continuing obligation" is sufficient. *Id.* Kansas Comment 1983.

When this standard is applied to the undisputed facts it becomes clear that Mr. Morales' conduct on January 17, 1992, constituted an anticipatory repudiation. Under the clear and unambiguous terms of the Purchase Agreement, Mr. Morales had an obligation to pay the full balance due on the aircraft. Although he maintains that he was always willing to pay the full balance, his words and conduct on January 17, 1992, would have indicated to any reasonable person that he was not willing to pay the last $219,000 of the balance unless Cessna would agree to certain conditions not required by the Purchase Agreement—such as the issuance of a credit memo in Mr. Morales' favor or the placement of the money in an escrow account pending resolution of the commission issue. The court finds as a matter of law that under the circumstances this was a repudiation of his obligation to pay the full amount. A refusal to perform except upon conditions not required by the contract generally constitutes a repudiation. *See* K.S.A. § 84-2-610, Official UCC Comment 2 ("[W]hen under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation.") *Cf. Unique Systems, Inc. v. Zotos International, Inc.,* 622 F.2d 373, 376 (8th Cir.1980) (Buyer repudiated the contract where buyer informed seller that it would not purchase the contract goods until market tests not required by the contract were performed.) The terms of payment in the Purchase Agreement were unambiguous and Cessna had no obligation to agree to conditions of payment that were not part of that Agreement.

Mr. Morales testified at trial that he always intended to pay the full balance due on the aircraft. He asserted that he never stated unequivocally that he would not pay the $219,000 if his conditions were not met. Under the UCC, however, the question of repudiation does not turn on whether Mr. Morales harbored a subjective intention to go ahead and pay the full amount if Cessna would not agree to his demand for an escrow arrangement. Rather, the question turns on what a "reasonable person" would conclude from the words and conduct expressed by Mr. Morales. Actions that "reasonably indicate" a rejection of the obligation are sufficient. When the parties met for the purpose of making final payment and taking delivery of the aircraft, Mr. Morales refused Cessna's insistence that he unconditionally pay the full amount. He produced a check at the January 17th meeting that was $219,000 short despite the fact that Cessna had previously notified him that it would not permit him to

deduct a commission from the balance due. Mr. Morales then left Wichita on January 17th—three days prior to the contractual deadline for payment—without making any further arrangements for payment. Given the undisputed facts, Mr. Morales' actions cannot reasonably be taken as anything other than a refusal to perform except on terms not required by the Purchase Agreement.[7]

Clearly, Mr. Morales wanted to be sure that he would receive a commission on the sale of unit 161. There are a number of reasons, however, why he could not properly require Cessna to guarantee that he would receive such a commission before he would pay the full purchase price. First of all, the written contract of purchase unambiguously required payment of the full balance when due. Mr. Morales was the purchaser of the aircraft and was bound by all the terms of the Purchase Agreement. Second, Cessna's agreement to pay a commission for the sale of the aircraft was with Aereotuy, not with Mr. Morales. Mr. Morales was not a party to the AESR contract with Cessna. Under the AESR agreement, Cessna had an obligation (assuming a commission would become properly payable) to pay the commission to Aereotuy. As such, Cessna was not obligated to make a determination as to whether Mr. Morales was entitled to the commission or to any portion of it. That was a matter between Aereotuy and Richair pursuant to the Aereotuy–Richair agreement. If after receipt of a commission Aereotuy had in fact refused to honor its agreement with Richair, as Mr. Morales apparently believed might happen, the proper course for Mr. Morales would have been to bring an action against Aereotuy for breach of contract.[8] Mr. Morales' desire to avoid a dispute with Peter Bottome over who was entitled to the commission, however, did not permit him to refuse to pay Cessna according to the terms of the Purchase Agreement.

In addition to the foregoing, the contingent nature of Cessna's obligation to pay a commission prevented Mr. Morales as a matter of law from withholding his performance pending an assurance from Cessna that he would receive a commission.[9] Under the unambiguous terms of Cessna's AESR agreement with Aereotuy, no commission would be payable unless and until full payment for the aircraft had been received by Cessna and the aircraft had been delivered into the area of responsibility of the AESR. Def.Exh. 9. Moreover, the commission was not payable until thirty days after such delivery. *Id.* At the time Mr. Morales came to Wichita to make payment for the aircraft, any obligation on the part of Cessna to pay a commission to its Venezuelan AESR was contingent upon the occurrence of future events, including the delivery of the aircraft into Venezuela. Cessna had no assurance on January 17, 1992, that the aircraft would in fact be delivered into Venezuela.[10] As such, Mr. Morales' arrangement with Aereotuy could not possibly justify a refusal to pay the full purchase price. In effect, Mr. Morales indicated to Cessna that he would not perform his obligation unless Cessna agreed to change the terms of the AESR agreement. This was an anticipatory repudiation of the Purchase Agreement.

7. Mr. Morales' repudiation of the contract makes moot any contention on the part of the plaintiff that the aircraft did not conform to the specifications agreed to by the parties.

8. Similarly, if Cessna had mistakenly paid Airtech instead of Aereotuy, Mr. Morales could have pursued an action for unjust enrichment against Airtech.

9. Neither party has discussed the applicability of K.S.A. 84–2–609 to the facts of this case. Section 84–2–609 allows a party in certain circumstances to suspend performance if it has not received adequate assurance of performance from the other party. Because it was not raised, the court concludes that any reliance upon that provision by the parties has been waived. At any rate, for the reasons expressed in the text the court concludes as a matter of law that it was not commercially reasonable under the circumstances for Mr. Morales to withhold payment on the Purchase Agreement pending an assurance that he would receive a portion of the commission. This is true notwithstanding Cessna's apparent error as to the Venezuelan AESR.

10. Under the evidence presented, there can be no dispute that as of January 17, 1992, Mr. Morales was considering the possibility of selling unit 161 to an individual in Mexico. Mr. Morales' testimony cannot reasonably be interpreted otherwise.

The plaintiff also argued that, even if Mr. Morales' actions constituted an anticipatory repudiation, the repudiation was subsequently retracted. *Citing* K.S.A. § 84-2-611. In support of this argument plaintiff relied upon Mr. Morales' letter of January 20, 1992, in which he indicated to Cessna that he believed there was a specification error in the aircraft and inquired how long it would take to correct it. According to the plaintiff, this shows that Mr. Morales intended to proceed with the contract.

Retraction of a repudiation "may be by any method which clearly indicates to the aggrieved party that the repudiating party intends to perform, ..." K.S.A. § 84-2-611(2). Mr. Morales indicated on January 17th that he would not perform on the contract unless Cessna agreed to set up an escrow account for a portion of the payment. Mr. Morales' letter of January 20th, however, did nothing to retract this previous position; it simply ignored the payment dispute. As such, the letter cannot reasonably be considered a "clear indication" that Mr. Morales intended to perform. The letter was absolutely silent as to whether Mr. Morales was withdrawing his prior position.[11] Under the circumstances, it was not a retraction of the anticipatory repudiation.

On January 21, 1992, after the time specified under the contract for payment had expired, Cessna notified Mr. Morales that it considered the contract to be in default. Pursuant to K.S.A. § 84-2-611(1), any attempts by Mr. Morales to retract the repudiation after this notification would have been legally ineffective.

3. *Breach of Contract.* Even if Mr. Morales' actions did not constitute a repudiation, the court concluded in the alternative that Aero breached the contract by failing to pay the balance due within seven days of the Ready-for-Delivery date. In this regard, the court notes that Aero's failure to perform was not excused by the alleged nonconformities of the aircraft; the evidence failed to show any such defects.

Similarly, the court concluded that Cessna did not breach the contract by failing to provide a customer test flight. The repudiation of the contract by Mr. Morales relieved Cessna of any obligation to provide a test flight. Moreover, the evidence showed that prior to January 21, 1992, Mr. Morales made no attempt to make arrangements with Cessna for a test flight nor did he make a request for such a flight. Under these circumstances, Cessna cannot be said to have breached the contract.

4. *Liquidated Damages.* The court concluded after hearing the evidence produced by the plaintiff that the liquidated damages provision in the contract was reasonable and enforceable. The court further concluded that the language of the Purchase Agreement showed that the parties intended and understood that the provision would allow Cessna to retain Aero's deposits if the balance of the purchase price were not paid when due.

a. *Reasonableness under the UCC.* K.S.A. § 84-2-718 provides:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience of nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

Under the Kansas UCC "reasonableness is the only test." *Kvassay v. Murray,* 15 Kan. App.2d 426, 808 P.2d 896, 900 (1991). Section 84-2-718 sets forth three criteria for measuring the reasonableness of liquidated damages: (1) anticipated or actual harm caused by the breach; (2) difficulty of proving loss; and (3) difficulty of obtaining an adequate remedy. *Id.* The propriety of liquidated damages is a question of law for the trial court to decide. *Id.*

After considering these criteria, the court determined that the application of the liquidated damages provision in this case was reasonable. The deposits liquidated by Cess-

11. Mr. Morales' letters of January 22, 1992, to Cessna make clear that Mr. Morales had not changed his position with respect to paying the balance due.

na under the contract amounted to $425,000. Cessna's expert offered his opinion that Cessna incurred actual damages in the amount of $436,751 from cancellation of the Aero contract. Pl.Exh. 49. Through cross-examination the plaintiff suggested that the actual damages sustained by Cessna were less than this estimate. Aero pointed out that Cessna resold the aircraft for close to the price originally agreed to by Aero, *see e.g.* Pl.Exh. 64, suggesting that the only damage incurred by Cessna was the costs associated with holding the aircraft before it could be resold. Aero further pointed out that Cessna's estimate of damages depended in part upon the selection of a rate of interest to determine these holding costs. Even considering the factors pointed out by the plaintiff, however, the court concluded that the liquidated damages bore a reasonable relation to the actual damages likely sustained by Cessna. Under the evidence presented, the court could not conclude that the amount of the liquidated damages was unreasonably large such that it amounted to a penalty. Nor could the court conclude that under the circumstances Cessna's retention of the deposits amounted to unjust enrichment. The evidence showed that it was difficult to determine with certainty the actual damages associated with such a cancellation. The calculation was complicated by the lengthy period of time required for production of such an aircraft and the uncertainties associated with supply, demand, and costs for such aircraft. The court notes that the deposits liquidated by Cessna were in an amount slightly less than ten per cent of the total purchase price of the aircraft. The court concluded that this amount was reasonable in light of the damages that Cessna could reasonably anticipate would flow from such a cancellation of the contract. The court further concluded that in light of the nature of the production of aircraft and the costs associated with maintaining production, it would not be feasible for Cessna to otherwise obtain an adequate remedy for breach. In sum, the court found that the liquidated damages were reasonable.

b. *Applicability of the Liquidated Damages Clause.* Aero argued that the liquidated damages clause of the contract was not applicable because Aero never "canceled" or "terminated" the agreement. The Purchase Agreement provided in part: "[I]n the event this Agreement is cancelled or terminated by Purchaser for any cause whatsoever, including Purchaser's failure to pay the balance on the aircraft and other charges under this Agreement when due, Seller shall retain, not as a forfeiture but as liquidated damages for default, all cash deposits theretofore made by Purchaser...." Aero argued that the use of the term "including" in the above cited provision created an ambiguity because it "leaves open the possibility that in [some] situations failure to pay when due is not a cancellation or termination" and the liquidated damages clause therefore might not apply to Aero's alleged failure to pay. *See* Plaintiff's Opposition to Def. Motion in Limine, Doc. 53.

The court rejected Aero's argument as an unreasonable construction of the contract language. The court concluded that this language unambiguously demonstrated that the parties' intent and understanding was that liquidation of deposits was authorized by the contract if the buyer breached its obligation to pay the balance when due. Under the language in question, a buyer who failed to pay for an aircraft when payment was due was considered to have "canceled" or "terminated" the agreement and was subject to the operation of the liquidated damages provision.[12]

D. *Conclusion.*

For the foregoing reasons, the court found that the defendant Cessna Aircraft Company was entitled to judgment as a matter of law and that the action should be dismissed on the merits.

12. The parties' intent is clear from the contract language. Thus, it is of no import that the parties' use of the terms "cancellation" and "termination" may have varied from the definitions provided in the UCC. *See* K.S.A. § 84–2–106 (Definitions). *See also* K.S.A. § 84–1–102(3) (Effect of provisions of the act may generally be varied by agreement.)