(946 P.2d 1010)
No. 76,225

MIGUEL A. DIAZ RODRIGUEZ, *Appellant,* v. LEARJET, INC., *Appellee.*

Opinion filed October 24, 1997.

*James R. Gilhousen,* of Crockett & Gilhousen, of Wichita, for appellant.

*Thomas D. Kitch, Mary E. May,* and *Lyndon W. Vix,* of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellee.

Before MARQUARDT, P.J., PIERRON, J., and NANCY E. PARRISH, District Judge, assigned.

MARQUARDT, J.: Miguel A. Diaz Rodriguez (Diaz) appeals from the district court's decision that a liquidated damages clause in his contract with Learjet, Inc., (Learjet) was reasonable and enforceable.

On August 21, 1992, Diaz executed a contract with Learjet to purchase a model 60 jet aircraft. The contract called for a $250,000 deposit to be made upon execution of the contract; a $750,000 payment to be made on September 18, 1992; a $1,000,000 payment to be made 180 days before the delivery date of July 30, 1993; and the balance of the purchase price to be paid upon delivery.

Diaz paid Learjet $250,000 on the day that he executed the contract, but made no other payment.

At the time of the purchase, Diaz worked for Televisa. Diaz was purchasing the aircraft at the request of Alejandro Burillo, his supervisor at Televisa. Near the end of September 1992, Burillo told Diaz that he no longer wanted the aircraft. Diaz testified that he called Alberto Castaneda at Learjet and told him that he was not going to buy the aircraft and that he wanted Learjet to return his $250,000 deposit.

On September 30, 1992, Castaneda sent Diaz a fax, requesting payment. On October 6, 1992, Castaneda wrote Diaz a letter, which stated, in part: "Unless we receive payment from you or your

company by October 9, 1992, [Learjet, Inc.,] will consider this agreement terminated and will retain all payments as liquidation damages in accordance with Paragraph C . . . of Section VII . . . of said agreement." By letter dated October 20, 1992, Learjet informed Diaz that it considered their contract terminated and that the $250,000 deposit was being retained as liquidated damages.

The contract provides, in part:

"Learjet may terminate this Agreement as a result of the Buyer's . . . failure to make any progress payment when due . . . . If this Agreement is terminated by Learjet for any reason stipulated in the previous sentence Learjet shall retain all payments theretofore made by the Buyer as liquidated damages and not as a penalty and the parties shall thenceforth be released from all further obligations hereunder. Such damages include, but are not limited to, loss of profit on this sale, direct and indirect costs incurred as a result of disruption in production, training expense advance and selling expenses in effecting resale of the Airplane."

After Diaz had breached the parties' contract, Circus Circus Enterprises, Inc., (Circus) contracted with Learjet to buy the aircraft. Circus requested that changes be made to the aircraft, which cost $1,326. Learjet realized a $1,887,464 profit on the sale of the aircraft to Circus, which was a larger profit than Learjet had originally budgeted.

Diaz filed suit against Learjet, seeking to recover the $250,000 deposit. Diaz' petition alleged, in part, that the actual amount of Learjet's liquidated damages was not $250,000 and that Learjet's retention of the $250,000 deposit was unreasonable and an unenforceable penalty.

The district court initially granted Learjet's motion for summary judgment, holding that the liquidated damages provision of the contract was reasonable. Diaz appealed that decision. On appeal, this court held that the district court had erred in using the wrong standard to evaluate the liquidated damages clause and in not examining all of the necessary factors and remanded the case to the district court for further consideration of the reasonableness of the liquidated damages clause. *Rodriguez v. Learjet, Inc.*, No. 71,352, unpublished opinion filed March 10, 1995.

On remand, a bench trial was held. Following the presentation of evidence, the district court found that Learjet was a lost volume seller and that its actual damages included lost profits. The district court held that $250,000 in liquidated damages was reasonable and upheld the liquidated damages clause.

Diaz argues that the district court erred in holding that the liquidated damages clause was reasonable and enforceable. Diaz reasons that the liquidated damages clause was unreasonably large and, therefore, void as a penalty.

A determination concerning the reasonableness and enforceability of a liquidated damages clause is a question of law subject to unlimited review by this court. *Kvassay v. Murray*, 15 Kan. App. 2d 426, 429, 808 P.2d 896, *rev. denied* 248 Kan. 996 (1991).

K.S.A. 84-2-718 governs liquidated damages in contracts for the sale of goods and provides, in part:

"(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty."

In *Kvassay*, 15 Kan. App. 2d at 430, this court noted that "reasonableness is the only test" for liquidated damages under the Uniform Commercial Code. This court paraphrased the three criteria for measuring the reasonableness of a liquidated damages clause provided in K.S.A. 84-2-718: "(1) anticipated or actual harm caused by breach; (2) difficulty of proving loss; and (3) difficulty of obtaining an adequate remedy." 15 Kan. App. 2d at 430.

A liquidated damages clause that " 'fixes damages in an amount grossly disproportionate to the harm actually sustained or likely to be sustained' " is considered a penalty and will not be enforced by the courts. *Luminous Neon, Inc. v. Parscale*, 17 Kan. App. 2d 241, 243, 836 P.2d 1201 (1992) (quoting 22 Am. Jur. 2d, Damages § 701, p. 758). If a liquidated damages clause is invalidated as a penalty, then the nonbreaching party may recover actual damages instead. *White Lakes Shopping Center, Inc., v. Jefferson Standard Life Ins. Co.*, 208 Kan. 121, 125, 490 P.2d 609 (1971). The burden of proving that a liquidated damages clause is unenforceable rests

with the party challenging its enforcement. *TMG Life Ins. Co. v. Ashner*, 21 Kan. App. 2d 234, 250, 898 P.2d 1145 (1995).

Diaz' challenge to the reasonableness of the liquidated damages clause focuses on the first factor of K.S.A. 84-2-718—the anticipated or actual harm caused by the breach. The question of whether a seller qualifies as a lost volume seller is relevant when evaluating whether a liquidated damages clause is reasonable in light of the anticipated or actual harm caused by the breach.

Diaz argues that the district court erred in concluding that Learjet qualifies as a lost volume seller. As a lost volume seller, Learjet's actual damages would include lost profits, notwithstanding that Circus purchased the aircraft which Diaz had contracted to buy and that Learjet made a profit on the Circus sale. The two contracts contained identical base prices, and both contracts had escalation clauses. The evidence indicates that the lost profit from the Diaz contract would have been approximately $1.8 million.

Whether a seller is a lost volume seller is a question of fact. *Bill's Coal Co. v. Board of Public Utilities*, 887 F.2d 242, 245 (10th Cir. 1989); Restatement (Second) of Contracts § 347, Comment f (1979); see *Jetz Serv. Co. v. Salina Properties*, 19 Kan. App. 2d 144, 150-52, 865 P.2d 1051 (1993). An appellate court reviews factual findings to determine if they are supported by substantial competent evidence. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993). Findings of fact shall not be set aside unless clearly erroneous. K.S.A. 60-252(a); *Tucker*, 253 Kan. at 378. "In reviewing the decision of a trial court, [an appellate] court must accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court, and must disregard any conflicting evidence or other inferences that might be drawn therefrom." *Tucker*, 253 Kan. at 377-78.

Courts have "unanimously" held that a lost volume seller can recover lost profits under § 2-708(2) of the Uniform Commercial Code. *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 681 & n.2 (7th Cir. 1987); see 1 White & Summers, Uniform Commercial Code § 7-9, p. 385 n.4 (4th ed. 1995) (listing cases that have applied § 2-708[2] to lost volume sellers). The Kansas Legislature has enacted this statute as K.S.A. 84-2-708(2).

In *Jetz*, 19 Kan. App. 2d at 148, this court explained:

"The 'lost volume seller' measure of damages 'refers to the lost volume of business the non-breaching seller incurs on buyer's breach. When the seller resells the entity he expected to sell to the original buyer, he usually deprives himself of something of value—the sale to a new buyer of another similar entity.' [*Snyder v. Herb Greenbaum & Assoc.*, 38 Md. App. 114, 154 n.3, 380 A.2d 618 (1977)]."

Similarly, Restatement (Second) of Contracts § 350, Comment d (1979) notes that if a seller would have entered into both transactions but for the breach, then the seller has lost volume as a result of the breach. Thus, lost profits are awarded to a lost volume seller, notwithstanding that the seller resells the item that a buyer contracted to buy, based on the principle that the seller was deprived of an additional sale and the corresponding profit by the buyer's breach. See *Jetz*, 19 Kan. App. 2d at 148-50; *Diasonics*, 826 F.2d at 682-83 n.7 (noting that resale does not reduce a lost volume seller's damages).

Awarding lost profits to a lost volume seller serves the general principle that the purpose of awarding damages is to make a party whole by restoring the nonbreaching party to the position that that party occupied prior to the breach—to place a seller in as good a position as if a buyer had performed. K.S.A. 84-1-106; *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 360, 837 P.2d 330 (1992); see *Jetz*, 19 Kan. App. 2d at 146-48.

The issue in *Jetz* was whether the plaintiff qualified as a lost volume *lessor*, and this court did not expressly state the specific requirements for qualifying as a lost volume seller. The *Jetz* court held that lost volume status is available to businesses providing services and identified the following evidence as sufficient to affirm the trial court's finding that the plaintiff was a lost volume lessor:

"[J]etz Service is in the business of supplying coin-operated laundry equipment; it has several warehouses in which it has available for lease about 1,500 used washers and dryers; it continually looks for new locations in which to install laundry equipment; it would have been able to fulfill the Kansas City lease without using the machines from Salina Properties; and it is uncontroverted Jetz Service would have been able to enter into both transactions irrespective of the breach by Salina Properties." 19 Kan. App. 2d at 152.

In *Diasonics*, 826 F.2d at 685, the court held that in order to qualify as a lost volume seller and recover for lost profits, a seller must establish three factors: (1) that it possessed the capacity to make an additional sale, (2) that it would have been profitable for it to make an additional sale, and (3) that it probably would have made an additional sale absent the buyer's breach. See also *R.E. Davis Chemical Corp. v. Diasonics*, 924 F.2d 709, 711 (7th Cir. 1991) (restating rule formulated in prior appeal of case); Kansas Comment 2 to 84-2-708 (citing first *Diasonics* case).

Here, in finding that Learjet qualified as a lost volume seller, the district court referred to *Jetz*, 19 Kan. App. 2d 144, Syl. ¶ 2.

Applying the more specific criteria established in *Diasonics*, 826 F.2d at 684-85, there is adequate evidence to support the district court's finding. The master scheduler for Learjet testified that Learjet was operating at 60 percent capacity during the relevant time period and that Learjet was able to accelerate its production schedule to produce more of the model 60 planes in any given year. Learjet also presented testimony about its accounting system which indicated that an additional sale would have been profitable to Learjet. Learjet's profit from the Circus transaction and the similarity between the Diaz contract price and the Circus contract price also indicate that the additional sale would have been profitable.

We agree with the district court that Learjet qualifies as a lost volume seller and that the $250,000 in liquidated damages was reasonable in light of the anticipated or actual harm caused by the breach. See K.S.A. 84-2-718(2).

Even if we were to conclude that Learjet was not a lost volume seller, there is authority to support the holding that the liquidated damages clause was reasonable. In *Aero Consulting Corp. v. Cessna Aircraft Co.*, 867 F. Supp. 1480, 1493-94 (D. Kan. 1994), the court held that a liquidated damages clause in an aircraft purchase agreement was reasonable under Kansas law. The *Aero* court did not consider the lost volume theory. The base price of the aircraft was $3,995,000. The liquidated damages, which were in the form of a deposit that was retained by Cessna after Aero breached, equaled $425,000. The court found that the liquidated

damages clause "was reasonable in light of the damages that Cessna could reasonably anticipate would flow from such a cancellation of the contract." 867 F. Supp. at 1494. The court also noted that "in light of the nature of the production of aircraft and the costs associated with maintaining production, it would not be feasible for Cessna to otherwise obtain an adequate remedy for breach." 867 F. Supp. at 1494. Under both analyses, the liquidated damages claimed by Learjet were reasonable.

Affirmed.